69 N.J. Super. 531 (1961)
174 A.2d 618
GEORGE J. MORAN, AN INFANT BY HIS GUARDIAN AD LITEM, JOHN MORAN, AND JOHN MORAN, INDIVIDUALLY, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
HANS J. FEITIS, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1961.
Decided October 20, 1961.
*533 Before Judges GAULKIN, KILKENNY and HERBERT.
Mr. Lester Weiner argued the cause for the appellants (Messrs. Weiner, Weiner & Glennon, attorneys).
Mr. Sidney M. Schreiber argued the cause for defendant (Messrs. Schreiber, Lancaster & Demos, attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
In this automobile accident case the jury brought in a verdict of $2,200 for the infant plaintiff George J. Moran, and $781 for the father for the exact amount of the medical bills incurred. Plaintiffs moved for a new trial as to damages only. The trial judge granted a new trial to the infant plaintiff as to damages only "unless the defendant agrees * * * to increase the verdict $1,500 * * *." The briefs raised some doubt whether defendant agreed to the additur, but at the oral argument both counsel stipulated that defendant had done so, and defendant withdrew the cross-appeal he had filed from the allowance of the additur.
We need consider only one of plaintiff's grounds of appeal, that the trial court should have ordered a new trial as to damages only without conditioning it upon the $1,500 additur, which plaintiff contends was far too little. Defendant, on the other hand, contends (1) that the $2,200 was ample and consequently the $3,700 is more than ample, and *534 (2) if there is to be a new trial, it should be as to all issues, including liability. Taking the last point first, we agree with the trial court that liability was clear enough to permit a new trial as to damages only. Coll v. Sherry, 29 N.J. 166 (1959); Dahle v. Goodheer, 38 N.J. Super. 210 (App. Div. 1955). The sole question is whether conditioning the order for a new trial on the $1,500 additur was proper.
The accident happened on April 4, 1957, when the infant was about 18 years old. At the time of the accident he was employed as a press operator by Westinghouse at a gross weekly salary of $84, which yielded him a take-home pay of $68. He was unable to return to work until July 14. In his summation plaintiff's counsel claimed a loss of wages during this period of approximately $1,000, which appears to be a fair estimate. A month after he returned to work, on August 13, 1957, he was inducted into the Army, where he remained for two years. He was not discharged for medical reasons but because his period of service was over.
However, plaintiff offered in evidence an exemplified copy of his army medical history which he claimed supported his oral testimony that during the two years in the army he suffered as a result of the injuries he had sustained in the accident. The trial court refused to allow the record in evidence because it consisted in large part of illegible photostatic copies of hospital and other records: that ruling is one of the grounds of appeal. While our views hereinafter expressed make it unnecessary to decide the propriety of that ruling in the present appeal, we state for future guidance that illegible records may be properly excluded.
Plaintiff and his doctors testified that he had suffered pain and temporary and permanent disability as the result of injuries to his head and his back sustained in the accident.
Defendant did not dispute that plaintiff had sustained an injury to his head, but disputed that the head injury was as serious as plaintiff claimed, and contended that he had fully recovered from it. However, defendant denied that plaintiff had suffered any back injury in the accident, and contended that if he was suffering from any back injury at *535 the time of the trial (which defendant also denied) it was caused by his army duties and not by the accident.
After the accident plaintiff was taken to the Elizabeth General Hospital. He was stuporous and vomiting. Dr. Horre, senior surgeon at the hospital, called into consultation Dr. Senerchia, Jr., a neurologist, and Dr. Ehrlich, an eye doctor. They diagnosed plaintiff's injury as a concussion with contusion of the brain. X-rays were negative, but a spinal tap showed pressure on plaintiff's brain. At the time of plaintiff's admission his eye fields could not be examined because of his stuporous condition. Subsequently plaintiff was found to be suffering from papilledema of the left eye and hemiopy, both indicative of a swelling of the brain. Plaintiff was discharged from the hospital on April 25, 1957 as "improved" but still showing papilledema.
Plaintiff testified he left the hospital with pains in his head, no vision in his left eye, and both knees and right elbow bothering him; he was confined to bed at his home for weeks, but still suffered from headaches, dizzy spells, blackouts, pain in the lower back, clogging and bleeding of the nose, weakness of his knees and difficulty with his vision.
Dr. Senerchia testified that when plaintiff was admitted to the hospital he had severe headaches and was suffering from brain damage. Electroencephalogram tests of April 9, 18 and 25 indicated abnormal brain-wave condition, but with gradual improvement; a test on May 24, 1957 showed the brain-wave was "within normal limits." The doctor testified that on May 21, 1957 "I noted * * * that there was some discomfort on deep forward bending, * * * he complained of some discomfort in the back, and I noticed some soreness to palpation in the left lower back, in other words, to palpating or deep pressure of the left lower back * * *"; and that on June 11, 1957 "he complained of some low back pain * * * he did show some tenderness at the level of the lower ribs bilaterally." On June 11 the papilledema was still present, and plaintiff still complained of severe headaches occurring once a week. On cross-examination the doctor testified: "May 21  that was *536 the first time I saw him as an out-patient after he left the hospital  he began complaining, `I get a pain once in a while above the belt line.' This was May 21, 1957. `If I make a sudden turn or bend, I get a pain like an electric shock that lasts a few seconds in the lower back.'"
Dr. Senerchia testified that on May 18, 1960, over three years after the accident and a few days before trial, he found the plaintiff still showed "residuals of a head injury."
Dr. Palin, the plaintiff's family doctor, stated that prior to April 4, 1957 the plaintiff was in excellent health. He first saw plaintiff May 6, 1957. At that time plaintiff complained of severe headaches and pain in his lower back when he moved or bent over. He had the same complaints on May 18, 20 and June 6. On June 21 plaintiff again saw Dr. Palin, at which time he complained of dizziness and nausea. The doctor noticed that his pupils reacted slowly to light. Dr. Palin conferred with Dr. Senerchia and as a result ordered plaintiff admitted to the Rahway Hospital on June 22, 1957, where he remained under observation for several days. Subsequently, Dr. Palin examined plaintiff several times, during which examinations he still complained of headaches and back pains. Although, when Dr. Palin examined him two days before trial, plaintiff appeared perfectly normal objectively, Dr. Palin expressed the opinion that plaintiff would continue to have trouble with his back and head for an indefinite number of years, during which the headaches would persist.
Plaintiff testified that while he was in the army he was troubled by the after-effects of the injuries to his head and back sustained in the accident; and that he frequently blacked out, was hospitalized, had electroencephalograms taken, and was fitted for a back brace.
The defendant produced Dr. Flicker, who examined plaintiff on October 29, 1959 and who testified that he could find no objective evidence of impairment of the nervous system. However, Dr. Flicker said that if plaintiff's subjective complaints were believed, "there is still some minimal post-traumatic cerebral symptomatology." Dr. Kruger, an orthopedist, *537 testified on behalf of defendant that he examined plaintiff on March 5, 1960, at which time he found plaintiff's back objectively normal.
Defendant also points to the fact that the hospital records of the Elizabeth General Hospital and the Rahway Hospital made no mention of any back complaints; that Dr. Horre had no recollection of plaintiff's complaining about his back (but he last saw plaintiff June 6, 1957); and that Dr. Senerchia testified that plaintiff told him that while "in the army he was working on the road, he was breaking up a road  he must have been with a road detail, he was handling a pick and shovel and then his back became stiff and then the following week while bending to pick up the papers he got a sharp pain in his back"; and that Dr. Senerchia admitted that the work on the road followed by the bending could have caused pain, and may have been the reason the army then fitted plaintiff with a brace. However Dr. Senerchia did not say, as defendant seems to suggest, that he attributed plaintiff's present back complaints to the army episode.
In his charge the trial judge reviewed, and submitted to the jury for its decision, the testimony as to the claimed injuries, including those to the back, and concluded:
"Now, having determined the true nature and extent of the plaintiff's injuries and incapacity, if any, proximately caused by the defendant's negligence, you must then decide what will be the fair, reasonable and adequate compensation for these injuries and incapacity."
Since the verdict was a general one of $2,200, it is impossible to determine with any degree of certainty upon the evidence in this case whether the award by the jury was for the head injury alone or whether it included something for the back injury. There may be cases in which such a determination is possible, but this is not one of them. Cf. Bachmann v. Passalacqua, 46 N.J. Super. 471, 473 (App. Div. 1957), certification denied 25 N.J. 406 (1957); Cermak v. Hertz Corp., 53 N.J. Super. 455, 463, 465 (App. Div. 1958), affirmed 28 N.J. 568 (1959); Annotations, *538 56 A.L.R.2d 221; 53 A.L.R. 771; 95 A.L.R. 1163. Had the verdict been for a substantial sum, the law would require us to presume that the jury found in favor of the plaintiff that he had suffered both injuries. It is not suggested upon what theory we may assume that the jury allowed nothing for the back injury simply because the verdict was small. Nevertheless, in ruling upon the application for a new trial, the trial judge said:
"Of course, as I have warned counsel time and time again in the trial of these cases, when they overload or exaggerate the injuries of their client, or when the client does that, and the jury believes that they are doing that, they are liable to get it in the neck. That's what happened to you. There is no question in the court's mind that this plaintiff was exaggerating his injuries, and the jury had the right, if they believed that he was deliberately misleading them in some material fact, to give little or no weight to the rest of his testimony.
So as far as the back complaints and injuries are concerned they are out. The jury had a right to determine that he suffered no back injury, because his own treating physician on January 6 of the following year, when he was discharged, said he had no complaints of the back, arm or neck, Dr. Horre, when he was discharged. I think that's Dr. Horre's testimony. Anyway it was at the last time Dr. Horre saw him." (Emphasis added)
This was not accurate. Dr. Horre last saw plaintiff June 6 of the same year as the accident. In addition, the court seems to have ignored Dr. Senerchia's testimony of back complaints on May 21 and June 11, 1957. Dr. Palin's testimony of lower back complaints on May 6, 1957 was dismissed by the court with the remark, "I think Dr. Palin said he found no objective symptoms, they were all subjective." Besides the fact that this was no justification for dismissing Dr. Palin's testimony altogether, this statement was not accurate. What Dr. Palin testified was that he found no objective symptoms sufficiently marked to warrant notation on his records. The erroneous underestimation of the plaintiff's case may itself vitiate an additur. Fisch v. Manger, 24 N.J. 66 (1957).
Finally the trial judge said:
*539 "Dr. Kruger could find nothing wrong with him orthopedically. So far as that back injury was concerned the jury was certainly justified in believing that he was trying to mislead them.
But on the other hand there's no question that the boy did suffer, and all the medical men have agreed that he did suffer a concussion and contusion of his brain. He suffered a brain injury and he was hospitalized for three weeks. Dr. Flicker did say, he too said that the probability is that he had a concussion and contusion of the brain at the time of the accident but he showed no signs of injuries today and that the prognosis was good.
That was Dr. Flicker, and the jury had a right to believe Dr. Flicker. But he did say that on October 29, 1959, when he examined the plaintiff the plaintiff [sic] he still had some symptoms of the brain injury at this examination. Of course, he was depending too upon the truth of the plaintiff as to his complaints. But there is no question that this boy did suffer a brain injury, and that he was hospitalized for three weeks, and I can't conceive a hospital under crowded conditions today keeping a boy for three weeks if it wasn't necessary. So I do feel that the damages awarded as far as the brain injury alone is concerned is against the weight of the evidence.
A new trial will be granted unless the defendant agrees, as far as the boy is concerned, to increase the verdict $1,500. That would be $3,700." (Emphasis added)
When counsel for the defendant protested, the court added:
"but on your own doctor's testimony, Dr. Flicker, [as to the head injury] I think the jury's verdict was inadequate on his testimony alone * * *"
In short, what the trial judge did was to determine that (a) the jury found plaintiff generally untruthful; (b) that he had not suffered a back injury in the accident, and that the jury so found; (c) the $2,200 verdict was all for the head injury, and (d) even on the testimony of defendant's own Dr. Flicker, $2,200 was not enough to compensate plaintiff for his head injury. In effect, therefore, the trial judge awarded plaintiff nothing for the back injury and $3,700 for the head injury.
We agree that the verdict of $2,200 was inadequate, even for the head injury alone. However, we hold that here the fixing of the amount of the additur upon the basis of the resolution of all doubts against this plaintiff made its use improper.
*540 In Fisch v. Manger, supra, it was argued that the use of the additur deprives the plaintiff of his constitutional right to trial by jury. The Supreme Court held that the additur does not necessarily do so, for when it is fairly invoked it preserves "the fundamental right of the parties to have the facts determined by a fair and impartial jury acting under appropriate judicial guidance and control." It is because the additur (and remittitur) must be used in a manner consistent with the right to trial by jury that the law requires the consent of the litigant adversely affected. We have hitherto held that this is the defendant in the case of the additur, and the plaintiff in the case of the remittitur. Webber v. McCormick, 63 N.J. Super. 409, 418-419 (App. Div. 1960); Bachmann v. Passalacqua, 46 N.J. Super. 471, 474 (App. Div. 1957), certification denied 25 N.J. 406 (1957). See, however, the "Wisconsin rule," infra.
In Fisch v. Manger, supra, the sole injury in issue was an injury to the back, for which the jury returned a verdict of $3,000. The trial judge increased the verdict to $7,500, saying "the plaintiff was not entitled to a `great sum, because he certainly did have a back condition before his accident occurred.'" The Supreme Court held that under the evidence the trial judge had no right to so discount plaintiff's claim. The Supreme Court set it aside and, instead of increasing the additur itself or ordering the trial court to do so, it ordered a new trial by jury as to damages only.
The trial judge may not use additur (or remittitur) in all cases over the objection of the parties. He may not use it in cases in which the verdict has failed to decide issues upon which the parties were entitled to a trial by jury, as distinguished from damages arising out of said issues. It is for this reason that additur (or remittitur) may be used only in cases in which a new trial as to damages alone is proper. Esposito v. Lazar, 2 N.J. 257, 259 (1949). But the trial judge may not use the additur over the opposition of plaintiff even in such cases without due regard to what is a fair substitute for plaintiff's right to trial by jury. We shall not attempt to catalogue the cases in which he may *541 not use it. It is sufficient for the purposes of this case to say that here disputes over substantial and separate claims of injury were advanced; each claim was supported by weighty credible testimony; and the disputes were not plainly resolved by the verdict when examined in the light of the evidence. The trial judge should not have resolved these disputes against the plaintiff by fixing the amount of the additur upon the basis of disbelief of him and all his witnesses.
If the trial court based the amount of the additur for the head injury on the testimony of defendant's Dr. Flicker, rejecting the testimony of plaintiff and his doctors, it would be so manifestly unfair to plaintiff that it would require reversal. However, it is not clear that the trial judge did base all of the $1,500 additional on Dr. Flicker's testimony. What is clear, though, is that the trial court concluded, without legal justification, that the jury had decided that plaintiff had sustained no back injury in the accident. Such use of the additur runs counter to plaintiff's right to trial by jury and, under the evidence, its use was "`an abuse of discretion' * * * or, in the more modern terminology, `"a manifest denial of justice."'" Fisch v. Manager, supra.
In deciding whether to condition the grant of a new trial as to damages only by the use of additur, it seems to us a trial judge should bear in mind that if the defendant thinks the additur too high, he may protect himself, for he has the absolute right to refuse to pay it and to take a new trial by jury instead, but that the plaintiff has no such protection. If the defendant accepts the additur, the plaintiff loses his right to trial by jury and his only recourse is to appeal, as he did here and in Fisch v. Manger, supra. The converse, of course, is true in the case of the remittitur.
Courts which permit the additur have adopted varying rules to reconcile the right to trial by jury with the fact that an additur may be forced upon a plaintiff, or a remittitur upon a defendant, against his will. See Annotations 56 A.L.R.2d 221; 53 A.L.R. 771; 95 A.L.R. 1163. In Wisconsin the rule appears to be that the trial judge may *542 give the option of agreeing to an additur or remittitur to either litigant. If the option is given to the plaintiff, the additur or remittitur must be for the lowest sum "which a fair-minded jury properly instructed would probably assess"; if the option is given to the defendant, it must be for the highest such sum. McCauley v. International Trading Co., 268 Wis. 62, 66 N.W.2d 633 (Sup. Ct. 1954); Risch v. Lawhead, 211 Wis. 270, 248 N.W. 127 (Sup. Ct. 1933).
Other courts have enunciated different rules. In O'Connor v. Papertsian, 284 App. Div. 245, 130 N.Y.S.2d 817 (App. Div. 1954), affirmed 309 N.Y. 465, 131 N.E.2d 883, 56 A.L.R.2d 206 (Ct. App. 1956), plaintiff was injured in an automobile accident. Her principal claim for damages was for a rash which she claimed resulted from treatment of the injuries sustained. After a verdict in his favor of $1,000, the plaintiff moved to set the verdict aside for inadequacy, contending that the verdict was inadequate even for the admitted injuries, without consideration of the rash. The trial court granted the motion and ordered a new trial. The defendants appealed. The Appellate Division held, in an opinion by presiding Justice Peck (emphasis ours):
"We are satisfied that the verdict was inadequate for the conceded injuries and are also satisfied that the jury was fully justified in finding that the rash was unconnected with the accident or injuries resulting from the accident. The question therefore is whether we must require a new trial, including the issue which the jury has properly adjudicated against plaintiff, merely because the jury made an inadequate award on the part of the case which they found in plaintiff's favor, or whether we may not properly place a value on the connected injuries as high as any jury would be warranted in going and give the defendants the opportunity of stipulating to pay such an increased verdict in lieu of suffering a new trial.
It would seem clear in reason and principle that the last alternative should be available to the court that the litigation may be brought to a just determination without involving the time and expense of another trial.

* * * * * * * *
In the case of an excessive verdict, the defendant cannot object if the verdict is held against him so long as the excessiveness is eliminated. Likewise, in the case of an inadequate verdict, a plaintiff cannot object so long as he is accorded the benefit of the verdict raised to an amount as high as that to which he would be justly entitled."
*543 In affirming, the Court of Appeals quoted the Appellate Division opinion with apparent approval.
In Markota v. East Ohio Gas Co., 154 Ohio St. 546, 97 N.E.2d 13, 19 (Sup. Ct. 1951), the court laid down a somewhat different rule:
"My conclusion is that, where the amount of a verdict is inadequate but not so inadequate as to indicate passion or prejudice and such verdict is not otherwise tainted with error, a new trial may be denied on condition that the defendant assents to an increase in the amount of the verdict to an amount which is more than the least that a reasonable jury would have awarded."
In Caudle v. Swanson, 248 N.C. 249, 103 S.E.2d 357, 363 (Sup. Ct. 1958), the court said that "By the additur procedure * * * the plaintiff * * * receives no less, but in fact more, than the jury awarded him by its verdict, and he receives no less than a reasonable jury might award him on the sharply conflicting evidence in the case." And in Seydel v. Reuber, 254 Minn. 168, 94 N.W.2d 265, 268 (Sup. Ct. 1959), the court said that the amount of an additur is proper if "it reasonably comports with the proof in the record." See also Dorsey v. Barba, 38 Cal.2d 350, 402, 240 P.2d 604 (Sup. Ct. 1952); comment, 40 Calif. L. Rev. 276 (1952).
It is not necessary for the decision of this case to decide which, if any, of the foregoing rules we would follow. Suffice it to say that here the trial court made no effort to reconcile the additur being thrust upon plaintiff with plaintiff's right to trial by jury. Instead, and contrary to even the least liberal of the foregoing rules, the trial court resolved all questions against plaintiff in fixing the amount of the additur.
For the reasons above stated we say as did the court in Fisch v. Manger, supra, 24 N.J., at page 80, "Under these highly special circumstances, we believe that the trial court's action should not be permitted to stand and that the interests of justice will best be served by permitting a second jury to pass on the issue of damages."
So ordered.